627 F.2d 499
 14 ERC 1705, 66 A.L.R.Fed. 356, 201
U.S.App.D.C. 40,
10 Envtl. L. Rep. 20,628
 SWINOMISH TRIBAL COMMUNITY, Upper Skagit Tribe and
Sauk-Suiattle Tribe, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
City of Seattle, Washington, Department of Lighting, Intervenor.
SWINOMISH TRIBAL COMMUNITY, Upper Skagit Tribe and
Sauk-Suiattle Tribe, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
City of Seattle, Washington, Washington State Department of
Fisheries and Washington State Dept. of Game,
State of Washington, Dept. of Ecology,
Intervenors.
CANADIAN INTERVENORS (R.O.S.S.) COMMITTEE and David M.
Brusson, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
City of Seattle, Washington, Washington State Department of
Fisheries and Washington State Dept. of Game,
State of Washington, Dept. of Ecology,
Intervenors.
AMERICAN INTERVENORS, North Cascades Conservation Council,
Wilderness Society, Sierra Club, Friends of the Earth,
National Parks and Conservation Association, National
Audubon Society, Federation of Western Outdoors Clubs,
Washington Environmental Council and the Mountaineers, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 78-1659, 78-1949, 78-1957 and 78-1958.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 19, 1979.
Decided June 20, 1980.
Rehearing Denied July 22, 1980.
 
 Robert S. Pelcyger, Boulder, Colo., with whom Lawrence A. Aschenbrenner, Washington, D. C. and Sharon K. Eads, were on brief, for petitioners in Nos. 78-1659 and 78-1949.
 Bruce J. Terris, Washington, D. C., with whom Roger M. Leed, Seattle, Wash. and Edward H. Comer, Washington, D. C., were on brief, for petitioners in Nos. 78-1957 and 78-1958.
 Kristina Nygaard, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Howard E. Shapiro, Sol., McNeill Watkins, II, Atty., Federal Energy Regulatory Commission, Washington, D. C., were on brief, for respondent.
 
 
 1
 Robert L. McCarty, Washington, D. C., for intervenor, City of Seattle in Nos. 78-1659, 78-1949, 78-1957 and 78-1958.
 
 
 2
 Charles B. Roe, Jr., Senior Asst. Atty. Gen. and Robert E. Mack, Asst. Atty. Gen., Olympia, Wash., were on brief, for intervenor, State of Washington, Dept. of Ecology in Nos. 78-1949, 79-1957 and 79-1958.
 
 
 3
 James M. Johnson, Senior Asst. Atty. Gen., Olympia, Wash., was on brief, for intervenor, State of Washington, Dept. of Fisheries, et al. in Nos. 78-1949, 78-1957 and 78-1958.
 
 
 4
 M. Frazier King, Jr., Atty., Federal Energy Regulatory Commission, Washington, D. C., for respondent in No. 78-1659.
 
 
 5
 Before MacKINNON and WALD, Circuit Judges and PRATT,* United States District Judge for the District of Columbia.
 
 
 6
 Opinion for the Court filed by District Judge JOHN H. PRATT.
 
 JOHN H. PRATT, District Judge:
 
 7
 This petition challenges the validity of orders[1] by the Federal Energy Regulatory Commission (hereinafter "Commission") approving an amendment to the license of the Department of Lighting of the City of Seattle (hereinafter "City") for the Skagit River Project No. 553 in Washington State. Application for the amendment was made to the Federal Power Commission[2] on December 17, 1970, more than 9 years ago. The orders under review raised the height of the present Ross Dam by 121 feet, thereby increasing the peaking capacity and energy output of the Ross Power Plant. The petitioners, all intervenors before the Commission, consist of three separate groups: the Swinomish Tribal Community, Upper Skagit Tribe and Sauk-Suiattle Tribe, et al. (hereinafter "Tribes"), the North Cascades Conservation Council, et al. (hereinafter ("American Intervenors") and the Run Out Skagit Spoilers Committee (R.O.S.S. Committee), et al. (hereinafter "Canadian Intervenors"). The principal intervenor[3] on the side of the respondent Commission is City, a large municipally owned electric utility serving a total population of approximately 750,000 persons. The issues have been fully briefed and argued and for the reasons set forth hereafter, we affirm the orders of the Commission and dismiss the petition.
 
 HISTORICAL BACKGROUND
 
 8
 The Skagit River rises in British Columbia, flows south across the international boundary and then west to its outlet in Puget Sound. Prior to 1920, when the Federal Water Power Act[4] was passed, which required federal licensing of all hydro-electric projects on navigable waters of the United States, City had constructed the Gorge development on the Upper Skagit, consisting of a concrete arch dam with a capacity of 175 MW (megawatts). In 1927, City in Project No. 553 was licensed by the Commission to construct a second development at Diablo, upstream from Gorge, and consisting of a concrete arch dam with a capacity of 159 MW. This license for Project No. 553 was for a 50 year period and covered three Skagit River dams and power plants, known in order proceeding upstream as Gorge, Diablo and Ross. Ross, the largest, was proposed for construction in four stages as power needs required. It contemplated an ultimate reservoir elevation of 1725 feet above mean sea level. Stages 1 and 2 were authorized in 1937 and 1942. Stage 3, by virtue of several Commission orders, the latest being 1967, raised the water surface of the Ross reservoir to 1602.5 feet, the present level.
 
 
 9
 The fourth and final stage for increasing the height of the Ross Dam for which application to the Commission was made in 1970, would raise the water surface in the reservoir (hereinafter sometimes Ross Lake) to 1725 feet. The orders now under review concern the Commission's approval of such construction (hereinafter High Ross).STATEMENT OF FACTS
 
 
 10
 The purpose of the High Ross amendment is to meet the growing energy needs of the Seattle area, served by City, its electric utility, and to provide sources of power important to the Pacific Northwest Power Pool. City's present resources are insufficient to serve both peak and base energy demands and this shortage has had to be made up by purchases from the Bonneville Power Administration (BPA). City and other preference customers have already received notice from BPA that by 1983 BPA will not be able to meet the demands caused by preference customer growth. It does not appear to be seriously contested that City is confronted with prospects of an acute energy shortage and must act to increase its existing supplies.[5]
 
 
 11
 The present development at the Ross Dam consists of a dam with a current height elevation of 1615 feet above sea level and a powerhouse with four generating units with a capacity of 252 MW. The present height of Ross Lake, the reservoir, is 1602.5 feet and the Lake presently covers a surface area of 11,700 acres.
 
 
 12
 The proposed High Ross amendment, by adding 122 1/2 feet to the existing structure, would increase the present generating capacity of the Ross development from 252 MW to 525 MW, an increase of 273 MW. This enlargement of capacity will result from the increase in the hydraulic or pressure head available to rotate the hydro-electric turbines which will result from the greater storage capacity of Ross Lake. Raising the present Ross Dam to permit a reservoir elevation of 1725 feet, which is 122 1/2 feet above the present elevation of 1602.5 feet, will make available an additional 292,000 kilowatts of peaking capacity and 30,000 kilowatts of firm energy. At the same time, Ross Lake will inundate an additional 8320 acres, 4720 in Canada and 3600 in the United States.
 
 
 13
 Because the reservoir at the maximum elevation of 1602.5 presently extends into Canada about one mile covering 480 acres and because the proposed construction of High Ross will further increase the surface area of the reservoir, Canadian interests have been implicated since Project No. 553 was originally authorized in 1927.
 
 
 14
 The Canadian-American Waters Treaty of 1909, 36 Stat. 2448, established an International Joint Commission (hereinafter IJC) over waters flowing across the international boundary. Article IV of the Treaty prohibits construction of dams on one side of the boundary which would raise the natural water level on the other, unless approved by the IJC. City received IJC approval for High Ross in 1942, conditioned on City's execution of a compensation agreement with the Province of British Columbia regarding the flooding of provincial lands. Work commenced on the initial stages of the Ross Dam and in 1947 the passage by the Province of the Skagit Valley Lands Act, authorized City to flood lands in the Province, subject to payment to be agreed upon. This resulted in a series of annual agreements, which covered inundation caused by the Ross reservoir to elevation 1602.5, the operating level of the third stage. In 1967, the Province and City executed a 99 year rental agreement to cover all lands in Canada flooded as the result of raising the surface of the Ross reservoir to elevation 1725. IJC approved this agreement, noting that the condition of its 1942 approval of High Ross had been met. Since 1967, City has been making annual rental payments of $34,566 as well as paying annual property taxes levied by the Province. The 1967 agreement permits the Province, at its option, to take such payments in electrical energy, which option has thus far not been exercised. To sum up, the present reservoir at elevation 1602.5 has a maximum surface of 11,700 acres, 480 acres of which are in Canada. High Ross with an elevation of 1725 will flood an additional 8320 acres, 4720 of which are in Canada. The present reservoir extends one mile into Canada; the enlarged reservoir will extend seven miles into Canada.
 
 
 15
 To complete this factual recitation, it is appropriate to single out the specific Acts of Congress passed by the same Congress on October 2, 1968 and having a direct bearing on the present proposal. (1) Section 5(a)(24) of the Wild and Scenic Rivers Act (hereinafter WSRA), 16 U.S.C. § 1276(a)(24) designated portions of the Skagit River approximately 11 miles below City's Gorge development for potential addition to the Wild and Scenic Rivers System established by the Act. During the Commission's consideration of High Ross, the lower Skagit was a "study river." The provisions of Section 7(b) of the WSRA have a bearing on the Commission's exercise of jurisdiction.[6] (2) The North Cascades Park Legislation established a diverse recreational complex comprising 1,642,000 acres in the North Cascades Mountains. A portion includes the headwater drainage of the Skagit River Basin. At the core are some 107,000 acres designated as the Ross Lake National Recreational Area. This area was specifically reserved to FPC jurisdiction because of City's planned further power developments. As Secretary of Interior testified in support of the North Cascades legislation:[7]
 
 
 16
 The Ross Lake reservoir built by the City of Seattle was one of the early hydro projects built in the Northwest. This is going to be a vital access area to a new national park.
 
 
 17
 The basic reasons supporting a natural recreation area are to permit a future raising of Ross Lake and more diversified and intense recreational use of this area than is normally the custom within a national park.
 
 
 18
 It is fair to say that the proposed amendment to High Ross is the culmination of a project licensed more than 50 years ago and was in the mind of Congress prior to the formal application made by City in 1970.
 
 PROCEEDINGS BEFORE THE COMMISSION
 
 19
 The 1970 application for approval of High Ross was given proper public notice and copies were distributed to federal, state and local agencies for review and comment, as was a draft environmental impact statement (hereinafter DEIS) prepared by the Commission staff and released in October, 1973. Hearings lasting 67 days took place during the period in the Seattle area and here in Washington, D.C. from April, 1974 to March, 1975. The hearing transcript of almost 10,000 pages included the testimony of 73 witnesses. Over 300 exhibits and 48 Items by Reference were admitted into evidence. The petitioning American intervenors and Canadian intervenors participated fully throughout the course of the hearings. On February 4, 1976, the presiding Administrative Law Judge (hereinafter ALJ) issued his Initial Decision which recommended approval of the City's application subject to numerous protective provisions. The matter then went before the Commission.
 
 
 20
 On October 4, 1976, while the Commission was giving consideration to exceptions to the Initial Decision of the ALJ, the petitioners Swinomish Tribal Community, Upper Skagit Tribe and Sauk-Suiattle Tribe sought for the first time to participate in the Commission's proceedings by filing a petition to intervene. They volunteered that they had no desire "to reopen the record to submit evidence" and that "they will take the record as they find it."[8] The ALJ's Initial Decision was affirmed and adopted by the Commission on July 5, 1977 in Order No. 808 which order granted the Tribes' motion to intervene upon the basis that the record would not be reopened.
 
 
 21
 All of the present petitioners asked for a rehearing and the Secretary of Interior, whose department had previously provided letters of comment on public access and recreation facilities (all ordered by the Commission) petitioned for the first time to intervene and simultaneously asked for a rehearing, a stay of Commission's order pending an examination of the impact on downstream fishery resources or, alternatively, for a 45 day stay to formulate conditions relating to fishery resources for inclusion in the license. On September 16, 1977, the 45 day stay was granted to Interior.
 
 
 22
 On March 9, 1978, the Tribes moved to dismiss the City's application for the High Ross amendment, on the ground that the 50 year license for Project No. 553 granted in 1927 expired by its own terms on October 28, 1977. This motion was denied by the Commission. During this period Interior submitted certain recommended license conditions relating to stream flow in the downstream Skagit.
 
 
 23
 On August 2, 1978, the Commission issued Opinion No. 808-A denying rehearing of Opinion No. 808 and denying reopening. At the same time it instituted a separate proceeding to consider Interior's proposed license conditions. The present petitions to review Commission's actions are now before this Court.
 
 THE ISSUES
 
 24
 The issues raised by petitioners are as follows:[9]
 
 
 25
 1. Whether the expiration of the original license on October 28, 1977 affected the power of the Commission to complete action on the High Ross amendment. (Tribes).
 
 
 26
 2. Whether the Commission is required under § 4(e) of the FPA, 16 U.S.C. § 797(e), to include, as part of the license amendment, conditions relating to downstream flows submitted by Interior and, since this issue was not argued on rehearing, whether it may now be raised on appeal. (Tribes).
 
 
 27
 3. Whether the Commission's orders are consistent with § 7(b) of the WRSA, 16 U.S.C. § 1728(b), without first having reviewed a determination from the Secretary of Agriculture that the scenic, recreational, fish and wildlife values of the Skagit River commencing more than ten miles downstream from the Gorge dam would be adversely affected. (American intervenors).
 
 
 28
 4. Whether the Commission acted properly in instituting a separate proceeding to consider the matter of downstream flow releases. (American intervenors and Tribes).
 
 
 29
 5. Whether in approving an amendment to the license for hydroelectric Project No. 553, which permitted an increase in the height of Ross Dam, the Commission fully complied with the requirements of NEPA:
 
 
 30
 (a) by adequately considering the environmental impact on lands in Canada (Canadian intervenors).
 
 
 31
 (b) by adequately considering alternatives. (American intervenors).
 
 
 32
 We turn now to a consideration of these issues in the order listed above.
 
 
 33
 1. The Expiration of the Original License as Affecting the Validity of the High Ross Amendment
 
 
 34
 The Tribes argue that the "annual license"[10] issued under § 15(a) of the Federal Power Act, 16 U.S.C. § 808(a) (hereinafter FPA), in the interim between the expiration of a license and a decision on an application for its renewal, cannot be amended. Their principal argument is that § 15(a) itself states that annual licenses are to be issued "under the terms and conditions of the original license . . . ." Id. Because the Tribes and the Secretary of Interior filed motions for reconsideration and a 45 day stay was granted by the Commission before the amendment became final and subject to judicial review, and because the initial 50 year term of the original license expired before that stay lapsed and before those motions were denied, the Tribes claim that § 15(a) prevents the addition to Ross Dam from being approved, i. e., that the Ross addition may be considered only in the pending relicensing proceeding. We reject this argument as lacking merit for three reasons: First, but for the Tribes' and the Secretary of Interior's motions for a stay and for reconsideration, the license amendment clearly would have been made final before the 50 year initial license term. Second, § 15(a) licenses are designed simply "to prevent a possible hiatus in the operation of a project . . . ." Lac Courte Oreilles Band v. FPC, 510 F.2d 198, 206 and n.29 (D.C.Cir.1975), and not to force the licensee back to square one in an amendment proceeding which is on the edge of completion after being seven years in process. Third, § 9(b) of the Administrative Procedure Act, 5 U.S.C. § 558(c) (1976), provides that when a licensee files an application to renew "a license with reference to an activity of a continuing nature," that license "does not expire until the application has been finally determined by the agency." In such circumstances, the expiration date is tolled. City filed a timely application to renew its license for Project No. 553; thus, under § 9(b) City's 50 year license in a sense has not effectively expired.
 
 
 35
 2. and 3. The Issues Concerning Compliance with § 4(e) of the FPA and § 7(b) of the WSRA
 
 
 36
 Both of these issues arise out of the present downstream conditions below the Gorge Dam and the Commission's statutory obligations under § 4(e) of the FPA and § 7(b) of the WSRA. It is acknowledged by all parties that the irregular water flows have caused injury to the spawning of anadromous fish and to the Indian Tribes which depend on them for sustenance and their commercial livelihood. When downstream flows are substantially lowered over a short period of time, anadromous fish fry are left stranded on sandbars and gravel bottoms and die. The problem was addressed, at least in part, more than 30 years ago when City and the Washington State Department of Fisheries in 1947 entered into an agreement which required a minimum discharge from the Gorge Dam of 1,000 cubic feet per second or the natural river flow, whichever is less. The particular interest of the Tribes who fish in the Skagit River stems from their rights under the 1859 Treaty of Point Elliott[11] between United States and certain Indian tribes[12] in Washington Territory and the decision of the Federal courts in United States v. State of Washington, 384 F.Supp. 312 (W.D.Wash.1974), aff'd and remanded, 520 F.2d 676 (9th Cir. 1975) interpreting the Treaty. It is worth noting that the Treaty does not guarantee the tribes "any constant quantity of fish, but merely equal access to fishing grounds" in common with all citizens of the (Washington) territory. The Treaty thus does not provide an independent basis for arguing that the flow of the river is required to be maintained at any particular level and gives additional support to considering the matter in a separate proceeding.
 
 
 37
 The statutory provisions which form the basis for these two issues, read as follows:
 
 
 38
 Federal Power Act, § 3(2), 16 U.S.C. § 796(2) in pertinent part:
 
 
 39
 (2) 'reservations' means national forest, tribal lands embraced within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; . . .
 
 
 40
 Federal Power Act, § 4(e), 16 U.S.C. § 797(e) in pertinent part:
 
 
 41
 Provided, That licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations. (Emphasis supplied).
 
 
 42
 Federal Power Act, § 10(a), 16 U.S.C. § 803(a):
 
 
 43
 (a) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adopted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes ; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval. (Emphasis supplied).
 
 
 44
 The Wild and Scenic Rivers Act, § 7(b), 16 U.S.C. § 1278(b) in pertinent part:
 
 
 45
 Construction projects on rivers designated for potential addition to system
 
 
 46
 (b) The Federal Power Commission shall not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act, as amended, on or directly affecting any river which is listed in section 1276(a) of this title, and no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval (Emphasis supplied).
 
 
 47
 Section 5(a)(24) of The Wild and Scenic Rivers Act, 16 U.S.C. § 1276(a)(24) designated portions of the Skagit River System approximately 11 miles below City's Ross, Diablo and Gorge developments for potential addition to the Wild and Scenic Rivers System established by the Act. During the Commission's consideration of High Ross, the Lower Skagit was a "study river" and the above cited provisions of § 7(b) applied to the Commission's exercise of its jurisdiction. Section 7(a) which is applicable to rivers already designated as part of the natural wild and scenic rivers system likewise prohibits the licensing of construction projects having "a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration." Section 7(a) goes on to read:
 
 
 48
 Nothing contained in the foregoing sentence shall preclude the licensing of, or assistance to, developments below or above a wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or reasonably diminish the scenic, recreational, and fish and wildlife values present in the area on October 2, 1968. (emphasis supplied)
 
 
 49
 The Secretary of the Interior or, where national forest lands are involved, the Secretary of Agriculture, are secretaries having jurisdiction to make determinations under the WSRA prior to licensing.
 
 
 50
 This brief reference to the applicable statutes serves to highlight matters concerning the primary jurisdiction[13] of the Commission to approve the High Ross amendment. In presenting the issues of the Commission's compliance with the specific statutory mandates of § 4(e) of FPA and § 7(b) of the WSRA, there are also raised difficult questions of statutory interpretation as well as policy questions concerning the participation of several executive departments in accommodating the public interest in the production of energy and in the conservation and protection of our natural resources.
 
 
 51
 On December 3, 1979 and following argument before the court on the various petitions to review the Commission's orders, the Secretaries of the Interior and Agriculture were given time to file a joint brief as amici curiae raising the question "whether, in the context of this case, this Court need to resolve certain issues regarding the respective areas of jurisdiction and authority as between the Commission and the executive departments" under the WSRA and the FPA "where those issues are currently being considered in Commission proceedings in which the appropriate executives are participating." Amici Brief, p. 3. In summary, both departments, without taking a position on the merits of the Commission's orders, urge that we need not consider the issues presented by § 4(e) and § 7(b) in the present proceeding because the matter of downstream impacts is now the subject of two separate proceedings in which both departments have intervened, i. e., the separate proceeding ordered in Order No. 808-A and the proceeding to consider the renewal of the permit for Project No. 553 in which proceedings the jurisdiction of both departments to impose conditions will be an important issue.
 
 
 52
 Both the FERC and City support the position of the amici for substantially the same reasons. As to the § 4(e) issue, both assert that the review provisions of § 313(b) foreclose our consideration of this issue because it was not raised by the Tribes on rehearing and Interior has sought no review in this proceeding. Section 313 of the FPA provides the general framework for rehearings before the Commission and for court review of Commission orders. More specifically, § 313(b) provides in pertinent part:
 
 
 53
 No objection to the order of the Commission shall be considered by the Court unless such objection shall have been before the Commission in the application for rehearing unless there is reasonable ground for failure to do so.
 
 
 54
 The record is devoid of any claim which would excuse the failure to raise the § 4(e) issue upon rehearing. Instead, we are being asked to rule on a question having an important bearing on the Commission's authority without such question being first addressed to the Commission. This we decline to do. It is clear, therefore, that we should not now reach out to consider a matter which the plain wording alone of the statute forbids our doing.
 
 
 55
 As to the § 7(b) issue, both FERC and City point out that the Commission found that High Ross will have no impact on downstream flows and will not diminish fish and wildlife values and that Interior and Agriculture, while insisting on their right to impose conditions, have not sought review of said findings and therefore are bound thereby. On a more practical level, Commission staff on July 20, 1979 met in Seattle with the parties to discuss issues concerning downstream flows. As a result, the staff reported that "progress was made toward an agreement that would provide controlled flows downstream from Gorge Dam while the parties conduct cooperatively the fishery and power studies necessary to compile an adequate factual record as the basis for deciding on the long term solution to the issues." Report of Commission Staff to Parties, August 29, 1979, Attachment 6 to City's Response to Amici Brief. In short, the § 7(b) issue, whatever is present validity before this court, may very well become a non-issue in the two separate proceedings pending before the Commission.
 
 
 56
 In response, the Tribes insist that we must decide the § 4(e) question and dismiss the Interior and Agriculture positions as "inexplicable," characterizing the separate proceedings as "a colossal waste of time." The American and Canadian intervenors in a more detailed response assert that the § 7(b) claims are based on issues of law which can be decided on the present record. Admitting that Interior and Agriculture failed to present their positions before the Commission (as well as failing to ask review of the Commission's orders), they suggest that we decide this legal issue without reference to the position of the two executive departments and, as an alternative, invite further briefing on this issue to ascertain such position. It seems to us that the § 7(b) issue can only be decided in the context of a full factual record reflecting not only the legal position of Interior and Agriculture but also the precise conditions which the two departments claim authority to impose under § 7(b). They also claim that Interior and Agriculture, in asking us to pass up a decision on the § 4(e) issue, did not seek to avoid a decision by this court that the Commission's alleged failure to develop a comprehensive plan, which considers the matter of downstream flows and their effect on the economic benefits of High Ross, violates § 10(a) as well as NEPA. At bottom, these intervenors fear that approval of High Ross, before the proper downstream flows are determined in separate proceedings, will permit City to proceed with construction and will prevent the Commission from making a decision increasing downstream flows because such an increase would undermine the economic justification for High Ross. In other words, the ability of intervenors to prevail ultimately, particularly in the matter of increasing downstream flows, would be seriously prejudiced.
 
 
 57
 Despite the superficial appeal of intervenors' argument we cannot agree. Aside from the failure of the Tribes to pursue the § 4(e) issue at a rehearing and the inaction of Interior and Agriculture in failing to ask for a review of the Commission's finding that High Ross will have no effect on downstream flows below Gorge, we are faced with a formal request from Interior and Agriculture that we need not reach these two issues in the context of this case. Implicit in this request is the recognition that §§ 4(e) and 7(b) raise basic questions concerning the respective areas of jurisdiction and authority as between the executive departments and the Commission which cannot be presently decided on the present record. The request further emphasizes that this record will be implemented in two separate proceedings, in which Interior and Agriculture have intervened and will present their respective positions. Under these circumstances, we believe that prudential considerations as well as interests of judicial economy require that we abstain from treatment of the §§ 4(e) and 7(b) issues in this review. This leads us to the next issue raised by the Tribes and American and Canadian intervenors.
 
 
 58
 4. The Propriety of the Commission's Action in Instituting a Separate Proceeding to Consider the Matter of Downstream Flow Releases
 
 
 59
 It is the position of the intervenors that the Commission should have reopened the record to consider "evidence as to the effects of the proposed minimum flow requirements on power production from Ross Dam and recreational opportunities there. R 17105." American Intervenors Brief, p. 30. The Commission refused to reopen the record and initiated a separate proceeding to consider the matter of downstream flows. Intervenors claim that the downstream flow issue should have been considered and decided in the present proceeding and, in effect, that Commission acted improperly in deferring this matter for consideration in a separate proceeding.
 
 
 60
 The record shows that after Opinion No. 808 was issued (July 5, 1977) and three years after the record was closed, Interior proposed that certain minimum flow requirements be attached to City's license. The American intervenors at this point moved to reopen the record to consider Interior's proposals. In Opinion No. 808-A, the Commission denied the request to reopen because, having found that High Ross will have no effect on downstream flows, it concluded that "the question of flow releases is not an issue in this proceeding." R 16964. At the same time, it recognized that the matter of downstream flows was a continuing problem and the possible necessity and appropriateness of the Interior's proposed conditions.[14] Accordingly, it set the matter down for consideration in a separate proceeding.
 
 
 61
 Given the fact that Interior's proposals had been filed seven years after the proceeding was commenced and more than three years after the record was closed and having found that the matter of downstream flows would not be affected by the construction of High Ross, the Commission determined to approve the amendment, at the same time ordering a separate proceeding.
 
 
 62
 It is well-settled that administrative agencies enjoy a broad discretion in the manner of carrying out their statutory functions and responsibilities. As the Supreme Court recently said in Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543-4, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978):
 
 
 63
 Absent constitutional constraints or extremely compelling circumstances the "administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.' " (citations omitted). Indeed, our cases could hardly be more explicit in this regard.
 
 
 64
 See also FPC v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 333, 96 S.Ct. 579, 583, 46 L.Ed.2d 533 (1976).
 
 
 65
 In the factual context of this case, the Commission's action in instituting a separate proceeding to consider the matter of downstream flow releases was well within the agency's discretion. Intervenors' position to the contrary is without substance.
 
 
 66
 5. The Issues Concerning Compliance With the Requirements of the National Environmental Policy Act (NEPA)
 
 
 67
 American and Canadian intervenors, both being represented by the same counsel, attack the Commission's action for failure to meet the requirements of NEPA. The Canadian intervenor's principal interest is in the preservation of 4720 acres extending over approximately seven miles in the Upper Skagit River Valley in Canada which the construction of High Ross would flood. The American intervenors, while concerned with the inundation of five miles of the Big Beaver Valley in the United States, concentrate on the failure of the Commission to give adequate consideration to the matter of other alternatives, particularly that of a lower dam at Ross. We now consider each of these challenges.
 
 A. The Impact in Canada
 
 68
 When City applied in 1970 for the amendment to permit construction of High Ross, the United States and Canada requested the IJC to investigate and report on the environmental effects in Canada resulting from raising the level of Ross Lake and to make such recommendations to the Commission as were appropriate for the protection of the environment in Canada. The IJC report,[15] consisting of 191 pages, gave thought to the method of analysis concerning the numerous aspects of this assignment and the procedure to be followed. It stated at the outset of its report (pp. 10-11):
 
 
 69
 It was clear that the nature of the environmental and ecological consequences could be established in terms of the impact of the proposed reservoir on various components of the environment land, water, flora and fauna. But forecasting these effects would provide no guidance as to their importance or significance. To report on the scope and impact of the consequences, further dimensions were added to the inquiry. These reflect both the amount and value of human uses associated with the environment. To compare the uses which would be possible 'with' and 'without' High Ross Reservoir, the amount and value of each use was estimated and the difference in total value of uses supported by the Valley was taken as an indication of the scope or impact of the consequences of the reservoir.
 
 
 70
 The IJC report considers in detail the potential effects of the flooding to be caused by High Ross and the possible protection and enhancement of the Valley. In so doing, it evaluated the area resources, physiography, plant ecology, wildlife and fisheries and recreation and compared the possible uses "with" and "without" High Ross. Pointing out that this area is one of great natural beauty and "worthy of special attention" and conceding that the enlarged reservoir would have an important environmental impact, the IJC nevertheless concluded that the overall detrimental effect in Canada of the proposal would not be substantial (pp. 28-29):
 
 
 71
 The present characteristics of the environment would be changed, but the new environment would retain many of the former characteristics. Those who appreciate and use the Valley in its present state would inevitably suffer somewhat, although other people would find the new environment at least as pleasant. Measured either by the amount of use, or weighted by dollar values, the overall impact of changes in the total environment is not significantly large.
 
 
 72
 The Commission staff prepared and released a draft environmental impact statement (DEIS) in October, 1973, to which it attached as an Appendix the IJC report concerning the Canadian environmental impact. After analyzing the comments on the DEIS, the staff released its final EIS (FEIS) in March, 1974 which cross-referenced the IJC report. Thereafter in April, 1974, the lengthy hearings were commenced which were concluded in March, 1975. At these hearings, the EIS and IJC reports were made a part of the record as were other studies submitted on the record which analyzed the Canadian impact of High Ross. The Commission in considering this question of Canadian impacts was not limited to the FEIS alone. It could and did consider the subsequent testimony and exhibits introduced during 67 days of hearings. Greene County Planning Board v. FPC, 455 F.2d 412 (2d Cir. 1972), cert. denied 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). More than a dozen of these witnesses focused on the matter of Canadian impacts. It was entirely appropriate to incorporate the IJC report as a part of the EIS. Inman Park Restoration, Inc. v. UMTA, 414 F.Supp. 99, 120 (N.D.Ga.1976), aff'd sub nom. Save our Sycamore v. MARTA, 576 F.2d 573 (5th Cir. 1978). To insist that the EIS must be prepared and considered in vacuo is to exalt procedural form over substance. To suggest the need of a supplemental EIS focusing specifically on the Canadian impact has an equally hollow ring. In 1974, such a motion by the American intervenors was denied without prejudice to being refiled should the parties "be able to demonstrate the existence of environmental impacts which are not covered by the final EIS and the IJC report." Apparently none of the petitioners saw fit to renew such a motion.
 
 
 73
 That these impacts concerned the Commission is reflected in the numerous conditions, imposed by the Commission in Opinion No. 808, which relate to the project's Canadian impacts, i. e., Article 54 (clearing of reservoir area in consultation with Canadian and Province agencies), Article 56 (Ross-Skagit fishery above the dam, requiring consultation with the British Columbia Fish and Wildlife Branch), Article 57 (wildlife resources and habitat, including preparation of a comprehensive plan), Article 58 (long range wildlife study) and Article 68 (recreational development in the Skagit Valley in Canada).
 
 
 74
 We can only conclude that both the ALJ and Commission gave careful consideration to the upstream effects of the larger reservoir on wildlife, fish and recreation both in the United States and Canada and took a "hard look" at these consequences. The record clearly shows that these effects were adequately evaluated in compliance with NEPA. The arguments of the Canadian intervenors that the Commission failed to do so are without merit.[16]
 
 B. The Consideration of Alternatives
 
 75
 NEPA's requirement that the agency's "detailed statement" address alternatives to a proposed action "has been aptly characterized as 'the linchpin of the entire impact statement.' " Alaska v. Andrus, 580 F.2d 465, 474 (D.C.Cir.1978), vacated in part sub nom. Western Oil & Gas Assn. v. Alaska, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978). The consideration of such alternatives in sufficient detail is required under the Federal Power Act as the basis for a determination that a project will be "in the public interest."
 
 
 76
 The American intervenors claim that the Commission failed to consider or consider adequately important alternatives in violation of the requirements of NEPA and the FPA. They have concentrated on three specific aspects in which they assert that Commission's consideration does not meet the test of adequacy.
 
 1. Construction of a lower dam
 
 77
 These intervenors argue that the added capacity for the project would be roughly the same at elevations 1725 or 1675. This, of course, is technically correct, because 525 MW of capacity would be produced at either elevation. They also point out that a lower dam and lower reservoir would cause less environmental damage by saving from inundation 3900 acres (out of 4720 acres) in the Skagit Valley in Canada and all or most of the Big Beaver Valley.
 
 
 78
 This alternative was not considered in the final EIS (R 10670-84). Apparently, American intervenors did not see fit to raise this subject by way of comment (R 10791-10820) and did so only in briefs to the Commission after the record was closed. The alternative of dams of lower elevations was mentioned in the comments from the Department of Interior, which comments, although received too late for analysis, were included in the EIS (R 10857). It received its first attention one year later during the testimony of American intervenors' witness Teasley who was called on rebuttal during the closing days of the hearings "to discuss the economic implications of raising Ross dam." (R 8600). The Initial Decision of the ALJ issued on February 4, 1976 while addressing a number of alternatives to High Ross in considerable detail appears not to have directly considered the alternative to the 1675 elevation (R 16311-19). The ALJ concluded his consideration of alternative by stating (R 16318-19):
 
 
 79
 The above arguments of the intervenors are not convincing. The City needs the peaking capability of High Ross which is not as cheaply obtainable elsewhere. It is the value of High Ross' peaking capability which makes it less expensive than any other peaking source combined with a based-load facility.
 
 
 80
 Intervenors failed to support their contentions to the contrary. The testimony of City and Staff show that proposed High Ross Dam is the most economic alternative for the City to obtain that amount of power for its system. A review of the environmental impacts of all the more expensive alternatives indicates that they would have adverse effects in quantity and quality at least as significant if not more so than High Ross. Accordingly, Intervenors' argument about the cost comparison is hereby rejected.
 
 
 81
 In Opinion No. 808, the Commission briefly discussed the 1675 elevation alternative and referred to it as a variation on the "No Action" alternative discussed in the EIS (R 16966-7). The EIS had disposed of the "No Action" alternative by stating (R 10676-7):
 
 
 82
 If an order approving the construction of the High Ross development is not issued by the Federal Power Commission, the Applicant and the Pacific Northwest would need to provide power from other sources to meet requirements as previously described. The Pacific Northwest Utilities Conference Committee's West Group Forecast shows an annual firm load growth for the area during the 10-year period (July 1973-June, 1983) of approximately 5.8 percent for peak load and 5.4 percent for energy. High Ross project output amounts to 3.6 percent of the 10-year period incremental peak demand and 1.5 percent of the incremental energy.
 
 
 83
 In Opinion No. 808-A, the Commission concluded its discussion of this alternative with the following (R 17144-5):
 
 
 84
 American Intervenors and R.O.S.S. continue to argue that the Commission has not fully explored alternatives to High Ross. American Intervenors say that the record is devoid of testimony or studies regarding the effects of raising the reservoir to 1675 feet of elevation, or any other alternate elevation between the present height and 1725 feet. They cite Aeschliman v. NRC, 547 F.2d 622, 628 (CADC 1976), in which the court said that where an intervenors' comments on a draft EIS raises a colorable alternative not considered already, the Commission must undertake its own preliminary investigation of the proffered alternative to determine whether it is worthy of detailed consideration in the EIS, and the Commission must explain the basis for each conclusion that further consideration of a suggested alternative is unwarranted. The court said, however, that the preliminary investigation of an alternative need not be nearly as detailed as that required of alternatives which are considered in the Environmental Impact Statement (EIS), and that often a short explanation will suffice.
 
 
 85
 As discussed in Opinion No. 808, a Ross Dam at 1675 feet will not deliver the power available at 1725 feet and that appears to by why no study was made of the environmental impact of this or alternative levels. Further consideration of this variation of the City's proposal is unwarranted. Contour maps in the record indicate that along most of the shoreline, because of the steep slopes, the fifty foot difference would not greatly affect the amount of the land flooded at the head of Beaver Canyon or at the northern end of the Canadian Skagit.[17]
 
 
 86
 In considering the validity of the Commission's conclusion that "further consideration of this variation on City's proposal is unwarranted," we must accept the fact that City has an unchallenged need for additional energy. The annual firm load growth for the Northwest area for the 10 year period (July, 1973-June, 1983) has been shown to be 5.8% for peak load and 5.4% for energy and that the High Ross annual incremental output of 329,900,000 KWH of energy amounts to 3.6% of the incremental peak demand and 1.5% of the incremental energy. Pacific Northwest Conference Committee's West Group Forecast. "Firm energy" is energy available at any time, even under adverse conditions; "peaking capacity" is the ability to supply energy during the hours of the highest daily, weekly, or seasonal loads. It is true that the total capacity of 525 MW would be produced at elevation 1675 as well as 1725. The additional capacity of both elevations results from the increased water pressure on the turbines caused by the higher water surface elevation of the reservoir. However, High Ross could maintain this capacity during a maximum drawdown of 56.2 feet to 1669 feet, where capacity would decrease by 5 MW. On the other hand, with an elevation of 1675 feet, the same maximum drawdown would lower the reservoir some 75 feet or less then the present maximum height of 1602.5 feet. More important, the 525 MW capacity at 1675 feet almost immediately would begin to decline to 450 MW. Low Ross' decline in capacity would occur when Seattle usually has its highest loads and requires maximum peaking capacity. High Ross would convert the present project with an elevation of 1602.5 feet from one of variable capability to one of almost constant capability. The Commission properly concluded that a 1675 foot dam would not produce the dependable power available from High Ross and therefore would not be appropriate.
 
 
 87
 In summary, the Commission considered and rejected elevation 1675 as a reasonable alternative. It determined that the environmental differences resulting from the two elevations were minimal, that the differences in energy capacity were substantial, and that, for these reasons, extensive consideration of this alternative was unwarranted. We agree.
 
 2. Delay in Construction
 
 88
 This alternative must fail because of the admitted power needs of City. It was considered by the ALJ and rejected (R 16338). Rather, the attention of the parties has focused on other alternatives available to meet the energy demands which were conceded by all. The alternative of delay was never in serious contention for this reason.[18] With the passage of approximately nine years since City's application was filed, the argument for further delay in construction has lost whatever validity it may once have had.
 
 3. Alternative Power Sources
 
 89
 The EIS considered in detail various alternative types of electric power generation. These included combustion turbine, combined-cycle (combustion and steam turbines), base load oil fired, base load nuclear steam-electric plants, conventional hydroelectric plants and purchased power. The annual cost of the incremental energy from High Ross was estimated and compared with the costs of such energy produced by other sources of energy. The beneficial and detrimental environmental effects were carefully considered for each alternative. (R 10670-81). In addition, the EIS considered and rejected the pumped storage alternative as not realistic and, admitting the desirability of electrical energy conservation practices and their long range importance, concluded that they would not eliminate the steady growth in energy demand and the need to expand capacity (R 10681-83). At the hearings, testimony indicated the permanent savings to be realized from City's existing conservation program to be 1%. (R 6806).
 
 
 90
 Testimony further indicated that rate manipulation would have little effect on demand, demand being inelastic because the price of City's electricity was so low that doubling of price would not affect consumption. (R 16967).
 
 
 91
 The ALJ reviewed the EIS study and, as stated previously (p. 28 supra ), found that "it is the value of High Ross' peaking capacity which makes it less expensive than any other peaking source combined with a base facility" and that "A review of the environmental impacts of all the more expensive alternatives indicates that they would have adverse effects in quantity and quality at least as significant if not more so than High Ross." (R 16318-9). The Commission agreed and in Opinion No. 808-A summarized its position. (R 17145):
 
 
 92
 As to other alternatives, the purchase of power from the Bonneville Power Administration is subject to what we consider to be an unassured sufficiency of capacity, and certainly energy, existing in the Pacific Northwest.[19] Other alternatives, such as steam and nuclear generation, are more expensive and as the FEIS points out, as well as supporting testimony, are subject to their own environmental problems. It is clear that the disadvantages of a fossil fuel or nuclear plant such as stack emissions, water heating, land clearing, mining, and loss of wildlife and recreation in the area cannot be mathematically compared with the disadvantages of High Ross. This is a matter of judgment. In our opinion, since the Ross Dam is already in place, it is likely that raising it would produce less impact on the environment than construction of a fossil-fuel or nuclear plant.
 
 
 93
 To conclude this aspect of our discussion, § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) requires, "to the fullest extent possible," the preparation of an EIS for "other major Federal actions significantly affecting the quality of the human environment." The purpose of such a statement is to enable the decision maker to take a "hard look" at the environmental consequences and to provide the public and Congress with information concerning the environmental issues involved. In this case Commission staff prepared a draft EIS and sent copies of the same to the parties and numerous interested groups for comment. A final EIS reflecting these comments was prepared and made public. The bulk of the long record, including testimony, exhibits and studies, was directed to, and focused on, the environmental impacts of High Ross as compared with alternatives to such construction. Such alternatives were considered and analyzed in detail on the basis of an exhaustive record and a decision rendered. We are satisfied that the procedural requirements of NEPA were complied with.
 
 
 94
 With such a record of procedural conformity, our function as a court of review is a limited one. We are guided by the most recent instruction of the Supreme Court that we are confined to the sole question of whether the Commission considered the environmental consequences of its decision. The court stated in pertinent language:
 
 
 95
 In Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, (98 S.Ct. 1197, 1219, 55 L.Ed.2d 460) (1978), we stated that NEPA, while establishing 'significant substantive goals for the Nation,' imposes upon agencies duties that are 'essentially procedural.' As we stress in that case, NEPA was designed 'to insure a fully-informed and well-considered decision,' but not necessarily 'a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency.' Vermont, Yankee cuts sharply against the Court of Appeals' conclusion that an agency, in selecting a course of action, must elevate environmental concerns over other appropriate considerations. On the contrary, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). See also FPC v. Transcontinental Gas Pipeline Corp., 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976). (footnote omitted).
 
 
 96
 In the present case there is no doubt that HUD considered the environmental consequences of its decision to redesignate the proposed site for low-income housing. NEPA requires no more. The judgment of the Court of Appeals is therefore reversed.
 
 
 97
 Strycker's Bay Neighborhood Council, et al. v. Karlen (3 cases), 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980).
 
 
 98
 In short, no arbitrary action having been claimed or shown and having found that the Commission fully considered the environmental consequences of its decision, we cannot interject ourselves "within the area of discretion of the executive as to the choice of the action to be taken." On this record, we cannot substitute our judgment for that of the Commission.
 
 
 99
 For all of the foregoing, the Commission's decisions in Opinions No. 800 and No. 800-A are
 
 
 100
 Affirmed.
 
 WALD, Circuit Judge, dissenting:
 
 101
 I dissent in this case because of my conclusion that several basic legal errors were committed in the course of this nine year license amendment proceeding that cannot be rectified in the new license renewal proceeding or in the "Article 37" license condition proceeding. Before setting these out, I voice an overriding concern about the piecemeal decision-making that took place in this proceeding, and the number of still unresolved legal issues that surfaced, largely because there has been no coherent plan for bringing together all of the agencies and statutory missions concerned with the decision at issue here.
 
 
 102
 Three separate federal agencies or departments jousted with each other for recognition of their statutory roles in the license amendment proceeding. The Secretary of Interior albeit belatedly proposed conditions under § 4(e) of the Federal Power Act to protect the anadromous fish on which the Indian tribes depend for food and commerce. The Commission insisted that he had no right to impose such conditions, only to recommend them; the Commission must have the final say. Much the same debate transpired as to the Secretary of Agriculture's right to decide if the elevated dam would have an adverse effect on any designated portion of the Skagit River under § 7 of the Wild and Scenic Rivers Act. The Commission refused to consider the Secretaries' concerns in this proceeding, authorized the increased elevation, and set up a different proceeding under Article 37 of the license[1] to consider the § 4(e) conditions. The two Secretaries have told us that they prefer to fight out their jurisdictional disputes in that docket or in the new license renewal proceeding that has just begun, rather than in this case. I do not believe that Congress meant its laws aimed at different interests energy, environment, Indian tribal rights to be disposed of in so fragmentary a manner when they converge on a single project, such as this dam. I believe they can properly be accommodated only in the same basic authorization proceeding.
 
 
 103
 For example, there is no guarantee that the Commission will rule on Interior's § 4(e) proposals or Agriculture's § 7 argument before construction of the elevated dam progresses too far for modifications to be made. Hearings on the license renewal have just started and could take 4-5 years to finish, according to Commission counsel at oral argument; the Article 37 proceeding likewise could take years. If conditions are adopted in either proceeding that will affect the downstream flows, there is evidence already in the record that those conditions might not be able to be accommodated without losing some of the dam's increased "peaking power"; yet an increase in peaking power was the essential reason for the High Ross proposal in the first place. It is of course possible and devoutly to be wished that the ancillary proceedings in which the Secretaries of Interior and Agriculture are vigorously demanding recognition of their statutory concerns could conclude soon enough to permit their outcomes to affect the construction and operation of the elevated dam, and perhaps resolve the documented interim problems affecting downstream flows which are expected during the draining of the reservoir that accompanies initial construction. But were that to happen, it would be luck, not foresight.
 
 
 104
 Our present energy crisis puts a premium on developing available sources of power as expeditiously as possible. But it is equally true that the energy crisis will probably be with us for years to come, and we can expect to be faced with persistent conflicts between new or expanded sources of energy and their attendant costs in other important resources and values. A 1975 publication of the Brookings Institution, analyzing significant problems for the decade 1975-1985 concluded:[2]
 
 
 105
 No matter how appropriate and cost-effective our energy and environmental programs, there will remain some conflict between the demand for energy and environmental protection goals. Only with great caution, however, should we consider sacrificing environmental quality to expand energy supply, given the longer-run implications of such a policy. At any given point, the sacrifices in environmental quality may appear to be marginal; but their cumulative adverse effect over time could be substantial, both on the environment itself and on the values of citizens whose perception of environmental quality is influenced by the environments to which they are accustomed. Progressive environmental degradation over time runs the risk of fostering a cumulative insensitivity to such degradation that would lend a self-fulfilling quality to the prophecies of those who contend that the populace prefers a steady expansion of energy supplies at the cost of continuing erosion of environmental amenities.
 
 
 106
 Of course, in making the inevitable trade-off decisions between energy and environment, the courts should not play a major role. We are duly cautioned about that in Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978):
 
 
 107
 . . . The fundamental policy questions appropriately resolved in Congress and the state legislatures are not subject to reexamination in the federal courts under the guise of judicial review of agency action . . . Administrative decisions should be set aside . . . only for substantial procedural or substantive reasons as mandated by statute, Consolo v. FMC, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), not simply because the court is unhappy with the result reached.
 
 
 108
 (Emphasis in original.)
 
 
 109
 Yet, courts must review agency action to insure that congressional intent is honored as to all the laws that bear upon a single decision; that task is well nigh impossible when the decision itself is splintered over many dockets. All of the legally critical issues pertaining to High Ross could have and should have been decided in one proceeding, and it is a management fault and a statutory lapse that they were not. It is, I fear, illustrative of recent criticisms on how we manage our limited resources:[3]
 
 
 110
 . . . (P)otentially serious environmental effects that are controllable as a technical matter . . . are now being so badly managed that both energy and environmental values may suffer unnecessarily in the long run . . . .
 
 
 111
 . . . It is the difficulty of managing these problems rather than the substantive nature of any one of them, that we view as crucial for energy policy . . . .
 
 
 112
 The specific issues on which I dissent are: (a) the Commission's obligation to consider existing downstream flow problems in making its required § 10(a) finding under the Federal Power Act; (b) the Commission's failure to consider the merits of the Secretary of Interior's conditions under § 4(e) of that Act; and (c) the Commission's obligation to consider the downstream effects of High Ross.[4]
 
 
 113
 A. The Commission's Obligation Under Section 10(a)
 
 
 114
 Section 10(a) of the Federal Power Act requires a finding by the Commission that the project at issue is "best adapted to a comprehensive plan for improving or developing a waterway" for commerce, water power or recreational and other public uses. 16 U.S.C. § 803(a) (1976) (emphasis supplied). The Commission is given the authority in § 10(a) to require the modification of proposed projects before approving them. Id.
 
 
 115
 The American Intervenors argue that § 10(a) required the Commission to consider existing problems stemming from irregular downstream flows, and proposals for their correction, as part of this amendment proceeding. All parties agree that the Commission would have to consider conditions to alleviate these problems in the new license renewal proceeding and they appear to agree as well that any new adverse effects emanating from the increased elevation would have to be recognized and accommodated in the § 10(a) finding in this proceeding. But the Commission here made the requisite § 10(a) finding principally relying on the fact that the licensee "does not propose any permanent change in the existing flow regime from the Project . . ., i. e., flow releases from Gorge Dam, so that the question of flow releases is not an issue in this proceeding." J.A. 260 (emphasis supplied; citation omitted).
 
 
 116
 The construction of the Commission's statutory responsibility is of dubious validity. The Commission obviously need not reconsider all aspects of Seattle's initial license and perhaps need not explore every existing detrimental condition on a waterway to comply with § 10(a) in considering an amendment to a project. But where a significant problem is acknowledged as with the plight of the anadromous fish here it does not seem to make much sense and is not in accord with the purposes to be served by a § 10(a) finding, to allow the Commission to take new actions which may in whole or in part foreclose other alternatives that would ameliorate these existing problems without regard to the § 10(a) comprehensive plan criteria merely because the licensee does not specifically propose to make an admittedly bad situation still worse.
 
 
 117
 That is what happened here. By refusing to consider the possibility of improving downstream flows in the amendment proceeding, the Commission in effect ruled, at least temporarily, that § 10(a) does not require any consideration of the way a proposed amendment will or can affect the totality of an integrated waterway project. I do not believe that is a proper construction of § 10(a)'s mandate that no amendment be approved unless it is "best adapted to a comprehensive plan for improving or developing a waterway."
 
 
 118
 A decision not to act in such circumstances potentially adversely affects the waterway. The Commission's failure here to consider correcting the concededly poor downstream flows from Gorge Dam by improving the discharges from High Ross, for example, was a decision to continue the inadequate flows since it is apparent that at least some of the increased water stored in the larger reservoir could have been used to improve the downstream fish habitat through greater or more uniform releases. In sum, I believe the Commission erred in not considering proposals to improve the downstream flows from Gorge Dam as part of its § 10(a) finding.
 
 
 119
 B. The Commission's Failure to Consider the Merits of the Secretary of Interior's Conditions under Section 4(e)
 
 
 120
 Section 4(e) of the Federal Power Act, 16 U.S.C. § 797(e) (1976), provides that the Commission is to:
 
 
 121
 (I)ssue licenses . . . for the purpose of constructing . . . dams . . . along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce . . . or upon any part of public lands and reservations of the United States . . . : Provided, That licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations. . . .
 
 
 122
 (Emphasis supplied.)
 
 
 123
 This language clearly required the Commission to make an affirmative finding as it did that High Ross will not interfere with or be inconsistent with the purposes of the "reservation."[5] But I believe it also required the Commission to consider[6] the merits of any conditions proffered by the Secretary of Interior to protect such a reservation before the Commission could make its own § 4(e) finding that the license would not interfere with the reservation.
 
 
 124
 A brief account of what transpired in the course of the Commission's consideration of this license amendment proposal is instructive.
 
 
 125
 Several times over the years of these proceedings the Secretary of Interior proposed specific conditions pursuant to § 4(e) designed to ensure adequate water flow and temperature controls to protect the spawning fish a cornerstone of the Indian tribes' livelihood. In May, 1974, for example, the Secretary notified the Commission that Seattle's estimates of minimal environmental effects were "overly optimistic," and that its plan to protect against fish and wildlife loss was "inadequate and . . . unsatisfactory." Letter from Under Secretary of the Interior to Kenneth Plumb, Secretary of FPC (May 13, 1974), J.A. 382, 383 (hereinafter May 1974 Interior Letter ). With reference to downstream effects, Interior indicated that the spawning fish population was presently suffering significant losses, primarily from fluctuations in water levels and that low-temperature water released from a deeper Ross Reservoir "would be of serious concern" and could "retard growth" of the young fish, "resul(t) in high mortalities" and "dela(y) downstream migration." Id. at 383-84. Specifically relying on § 4(e), Interior proposed several license conditions intended to help solve these problems. Id. at 385.
 
 
 126
 In 1976, Interior stated it would expand its § 4(e) conditions to protect the Indians' fishing rights if the license amendment were approved. Noting that several Indian tribes have treaty-secured fishing rights in the Skagit River below the dam project, Interior protested to the Commission that the impact of High Ross on those fishing rights had not been adequately considered and that the amendment application should be considered in the course of a general review during the relicensing of the project. Letter from Under Secretary of the Interior to Kenneth Plumb, Secretary of FPC (Dec. 3, 1976), J.A. 339.
 
 
 127
 In September 1977 Interior again wrote; it found the record sufficiently developed the problem of young fish being stranded because of poor flows downstream from Gorge Dam, but it proposed further study of how those flows affect spawning. Letter from Deputy Under Secretary of the Interior to Kenneth Plumb, Secretary of FPC (Sept. 21, 1977), J.A. 365, 366. Interior also proposed several additional § 4(e) license conditions in 1977: (1) mandating the maintenance of minimum water flow, (2) requiring monitoring of water temperature and, if necessary, construction of facilities to prevent temperature changes, (3) requiring maintenance of downstream water levels during construction, and (4) providing for further studies and later revisions of license conditions if necessary. Id. at 367-69.
 
 
 128
 In August 1978, the Commission issued its final order denying rehearing of its order granting the license amendment. City of Seattle, Dept. of Lighting, Project No. 553, Opinion No. 808-A, August, 1978, J.A. 283. The Commission refused to incorporate the Secretary's § 4(e) conditions, stating that the "project is needed and should be built." J.A. 290A. It felt that further delay to consider the § 4(e) conditions would be unwarranted. Conceding that the intervenors' concerns with downstream effects "raise substantial points," the Commission nevertheless decided to treat the Secretary's conditions only as a "recommendation," id., to be considered in a separate proceeding and to be balanced against energy needs and development of the area for recreational use, id. at 291.
 
 
 129
 In light of the congressional mandate to the Commission under § 4(e) of the Federal Power Act to make a finding that the raising of the dam would be consistent with the purposes of the reservation within which the dam is located, I believe that the Commission in this proceeding was legally obligated to rule on the merits of the Secretary of Interior's § 4(e) conditions. In the event that the Commission disagreed with the merits of the Secretary's conditions, its position on those issues should have been established. I cannot read the statutory mandate otherwise.
 
 
 130
 C. The Commission's Obligation to Consider the Downstream Effects of High Ross
 
 
 131
 I also find the record inadequate to support the Commission's conclusion that raising the dam would not in any way worsen the existing serious downstream flow problems.[7] My reading of the record raises enough serious doubts about the basis of the Commission's finding that no new adverse effects would result to compel my conclusion that the Commission should itself have conducted a further investigation to assure the validity of this vital linchpin of its decision. For if there were substantial new downstream effects with the potential for further damage, the Commission's determinations under §§ 4(e) and 10(a) of the Federal Power Act were critically flawed. The bases for my doubts in the record about no new effects are set out below. They are sufficiently troublesome that I cannot agree that there is substantial evidence to support the Commission's finding of no new effects.
 
 
 132
 It is acknowledged by all parties that the present irregular flows from Gorge Dam have created substantial problems for the anadromous fish and the Indian Tribes who depend on them for sustenance and commercial fishing. A 1947 agreement between Seattle and the Washington State Department of Fisheries requires a minimum discharge from Gorge Dam of 1,000 cubic feet per second (cfs), or the natural river flow, whichever is less. But the record is replete with evidence of young salmon and other anadromous fish fry being stranded and left to die on sandbars and gravel bottoms in the Skagit below Gorge Dam because of irregular discharges.
 
 
 133
 The Commission's persistent posture, of course, is that there is nothing in the record to show that the addition to Ross Dam will make these problems any worse than they are now. This conclusion is largely based on the fact that in its original application for the Ross elevation amendment, Seattle stated it planned no change in the downstream flow regimes from Gorge after the Ross Dam was elevated. J.A. 260. At the time the draft Environmental Impact Statement (EIS) was circulated, however, several Departments (Interior, Agriculture and Commerce) raised questions about the effect of the increased Ross elevation on water flows and fish downstream from Gorge Dam. See American Intervenors (AI) Br., App. A-E. The Forest Service of the Agriculture Department wrote in 1971 that "(o)ur main concern is with the possible effects of the project on flow in the river downstream from the dam," because the "lower Skagit River" was under study for inclusion in the Wild and Scenic Rivers System. Letter from Acting Associate Deputy Chief, Forest Service, to Kenneth Plumb, Secretary of FPC (July 16, 1971), AI Br., App. B. The Commerce Department also objected in 1971:
 
 
 134
 We believe project-caused sharp flows could interfere with spawning and raising of anadromous fish. This condition could become more severe as thermal power facilities are developed, as the project will be used primarily for peaking power. The project effect on downstream fish production areas should be stated on the applicant's Environmental Statement.
 
 
 135
 R. 15708.
 
 
 136
 In 1972 the Department of the Interior wrote to the Commission, protesting that the draft EIS was not adequate and should be rewritten to take account of possible effects on fish; it stressed further studies were needed to evaluate such effects. R. 15721. Interior cited possible detriments to the downstream fish emanating from the elevated dam because of a possible decrease in the amount of dissolved oxygen, diminished temperatures and an increase of sediment in the downstream flows; it also asked for an assessment of phyloplankton production. Again in 1974 after the final EIS had been circulated, Interior wrote to "oppos(e)" the project "(i)n view of the fish and wildlife losses expected" and the results of the three years of intervening study which were termed "inconclusive" and indicative of the need for "further study." May 1974 Interior Letter, J.A. 382 & 383. As noted above, Interior then proposed specific conditions under § 4(e) for inclusion in the license.[8]
 
 
 137
 The final EIS acknowledged that "during filling . . . , applicant may propose to maintain downstream flows at a lower level than normal. Sustained low flows could have an adverse effect on the emergence and rearing of salmonid fry. However, a schedule for reduced flows has not been proposed." R. 10714. Filling would take approximately two years. Additionally, Interior appended more detailed comments to its May 1974 letter which predicted "substantial siltation, turbidity and associated water quality problems would occur, which would have an adverse effect on aquatic resources not only in the existing reservoir but downstream as well" during the construction and clearing of lands for the newly enlarged reservoir.[9] AI Br., App. A, comments at 8. Interior also evidenced concern about other potential downstream problems that might be "amplified" by the raising of the dam:
 
 
 138
 We are concerned also about potential temperature problems occurring in flow releases from the system if the project is constructed. Studies by Licensee's consultants indicate that unusually cold water could be released from the system, thereby affecting anadromous fish egg and fry survival downstream. Cold water temperatures, below that normally tolerated by salmon and steelhead trout, will retard egg and fry development and, if low enough, can cause mortalities. This in combination with irregular flow releases could decimate the important anadromous stocks of the Skagit River. Irregular releases from the Ross System will continue to be a problem downstream with or without the project. With the proposed raising of Ross Dam, and planned peak power generation, these problems could be amplified.
 
 
 139
 Id. at 9.
 
 
 140
 Despite these apprehensions expressed by the other agencies concerned with the project, the Commission in its decision approving the license summarily dismissed any such effects as unanticipated by Seattle. J.A. 260.[10] In 1977 when the ALJ rendered his initial decision, he had stated that the downstream flows would not change, and rejected a request by the Washington Department of Fisheries for mandatory downstream flows. Supp. J.A. 427. The Commission's July 1977 decision accepted that characterization of the "record" as to both flow and temperature finding that neither would be appreciably affected. J.A. 260.
 
 
 141
 But in its petition to intervene in August, 1977, Interior again asserted that "(t)he operation of the Skagit River Project could have a detrimental impact on the Skagit River downstream fishery" and that "(w)ithout proper conditions . . . , the Tribes' fishing rights in the Skagit River would be severely impaired." R. 17071, 17072. The final EIS on this point is somewhat ambivalent, concluding only that the enlargement to Ross Dam "should not be a long-term factor in aggravating or alleviating" the problem of young fish being stranded because of irregular downstream flows. R. 10714 (emphasis supplied).
 
 
 142
 I thus cannot accept the Commission's principal reliance on the licensee's assurances that no downstream changes were anticipated in making its finding that no such changes would occur. The Departments of Interior, Commerce and Agriculture, as well as several state agencies, put the Commission on notice that significantly altered downstream flows were a serious enough possibility that the Commission should have developed the record further.
 
 
 143
 Serious questions remain unanswered in this record: most pertinently, how longer-lasting peaking at High Ross, which would seem inevitably to result in further irregularities in the discharges from Ross, can have no effect downstream on the Gorge Dam discharges that affect the fish.[11] For example, one of Seattle's principal witnesses admitted that because of its low storage capacity, increased controls cannot in fact be put upon the downstream flows at Gorge if the Ross discharges do change.[12]
 
 
 144
 In denying rehearing the Commission chose its words carefully; because of its importance, the Commission's reasoning bears repeating:
 
 
 145
 (t)he record shows that the application for High Ross does not propose any permanent change in the existing flow regime from the Project . . . i. e., flow releases from Gorge Dam, so that the question of flow releases is not an issue in this proceeding.
 
 
 146
 J.A. 260 (emphasis supplied; citation omitted). I do not think that finding is sufficient in light of the issues raised in the proceeding or the Commission's statutory obligations. I believe the Commission was obliged to make findings on what the flow releases from Ross Dam would be during the operational phases of High Ross and how they would affect discharges from Gorge. The Commission should also have explored whether the Gorge releases would be significantly affected during the two year period of construction and filling; two years is a long time in the life of anadromous fish. It is entirely possible that such findings might have triggered a determination by the Secretary of Agriculture under the Wild and Scenic Rivers Act that High Ross would affect the position of the Skagit River protected under § 7 of that Act, or made a difference in the Commission's own findings under §§ 10(a) and 4(e) of the Federal Power Act.
 
 
 147
 Because of these fundamental errors in the proceedings, I dissent from approval of the license amendment application.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 Opinion No. 808 issued July 5, 1977 and Opinion No. 808-A issued August 2, 1977
 
 
 [2]
 The functions of the Federal Power Commission (FPC) were taken over by the Federal Energy Regulatory Agency (FERC) on October 1, 1978 pursuant to Department of Energy Act, 42 U.S.C. § 7172. The term "Commission" is used interchangeably to refer to the FPC on actions prior to October 1, 1978 and to the FERC thereafter
 
 
 [3]
 Other named intervenors are three departments of the State of Washington, i. e., the Department of Ecology, the Department of Fisheries and the Department of Game. Of these three departments, only the Department of Ecology filed a brief herein, in which it asserted that the procedural requirements of the National Environment Policy Act (hereinafter NEPA) had been complied with and urged affirmance of the Commission's orders
 
 
 [4]
 41 Stat. 1063, as amended, now Part I of the Federal Power Act, 16 U.S.C. §§ 79a, et seq. as amended
 
 
 [5]
 The Commission specifically found: "We therefore find that there is a regional need for High Ross power and a need for the power on the system of the City of Seattle." Order No. 808, p. 19
 
 
 [6]
 Commission argues that the legislative history indicates that the Congress did not intend the WSRA to prevent the construction of High Ross. It quotes the Conference report in describing the purpose of an amendment to § 7 (Commission Brief, pp. 48-9):
 Section 7: This section is amended to make clear that water developments above or below a wild, scenic or recreational river area which do not "unreasonably" diminish its values are not prohibited. In this connection, reference is made to the Skagit River.
 1968 U.S.Code Cong. & Admin.News, p. 3854.
 
 
 [7]
 Hearings on S. 1321 before the Subcommittee on Parks and Recreation of the Senate Com. on Interior and Insular Affairs, 90th Cong., 1st Sess., at 12 (1967)
 
 
 [8]
 The Tribes' petition to intervene also noted that they were in the process of preparing evidence to support their claim of impairment to the downstream fishing rights caused by Project No. 553, which they planned to present in the separate relicensing proceedings which were to follow the expiration date of City's original 50 year license granted in 1927
 
 
 [9]
 Petitioners or petitions raising a particular issue indicated in parenthesis
 
 
 [10]
 Such a license was issued in this case at the time City's 50 year license expired in October, 1977
 
 
 [11]
 Art. V of the Treaty, 12 Stat. 927, provides:
 The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands. Provided, however, that they shall not take shell-fish from any beds staked or cultivated by citizens.
 
 
 [12]
 The Upper Skagit and Sauk-Suiattle Tribes were parties to the Treaty. The Swinomish Reservation is apparently not a separate tribe but a tribal reservation which many tribes, including a majority of the Sauk-Suiattle and some of the Skagit Tribes, presently occupy. In modern times, there are about 30 Sauk-Suiattle Indians, who fish for their personal use but not commercially. Similarly, there are about 30 Upper Skagit Indians interested primarily in subsistence fishing. Their "usual and accustomed fishing places" include "numerous areas along the Skagit River, extending from about Mt. Vernon upstream to Gorge Dam." United States v. State of Washington, 384 F.Supp. 312, 376, 379
 
 
 [13]
 Our use of the term "primary jurisdiction" reflects our understanding of the entire statutory scheme which places on the Commission the obligation to see to it "that the project adopted . . . shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways . . . ." EPA, § 10(a), 16 U.S.C. § 803(a). It is the Commission's position that its mandate under this provision requires it "to exercise its judgment in determining the extent to which it will include a Secretary's proposed conditions in a license." Opinion No. 36, Escondido Mutual Water Co., Project No. 176, (issued Feb. 26, 1979) slip op. pp. 95-108
 
 
 [14]
 In refusing to reopen, the Commission found: "That is not to say that Interior and the Tribes do not raise substantial points with respect to a higher rate flow below the Gorge Dam, but it is clear that increasing the height of the Ross Dam will not affect the flow regime. (R 17152). (emphasis supplied)
 
 
 [15]
 The IJC report is entitled "Environmental and Ecological Consequences in Canada of Raising Ross Lake in Skagit Valley to Elevation 1725."
 
 
 [16]
 We are aware that the Canadian Parliament by unanimous resolution has expressed its opposition to the flooding of the Skagit Valley and that the Canadian government has addressed two letters to the State Department expressing this opposition. This opposition does not deprive the IJC of its jurisdiction under the treaty and the State Department has indicated that it saw "no reason why the (Commission) should not proceed expeditiously to exercise its domestic regulatory responsibilities in this case." (R 16873). Also, under the British North America Act 1867, 4 Halsbury's Statutes of England, 205 (3rd ed.), the "management . . . of public lands belonging to the province," is made a subject of exclusive provincial legislation. Id., 92(5)
 
 
 [17]
 American intervenors have claimed that a lower dam with elevation 1675 would save 3900 acres from inundation. City argues that because of the steep slopes shown on the contour maps, only some 1900 acres would be saved from flooding and therefore that the environmental consequences of a dam at either elevation were not as significant as American intervenors claim. Brief of Intervenor City, p. 31
 
 
 [18]
 The comments on the DEIS do not mention delay as an alternative (R 10685-97) and American intervenors apparently did not argue delay in construction as an alternative prior to this appeal
 
 
 [19]
 In dismissing the purchase of BPA power as a "proper alternative" to High Ross, the ALJ pointed out that BPA power is more expensive (using any reasonable discount rate) and that supplying such power to City would require BPA to deprive other customers, who as a consequence would be required to expand their facilities and meet their own environment problems. He stated that "Pacific Northwest will have a deficit of peaking power through the next 20 years even with High Ross and all the peaking power BPA can obtain by adding units to federal dams." (R 16314)
 
 
 [1]
 Article 37 of the license provides:
 The licensee shall in connection with the Gorge development, construct, maintain, and operate such protective devices and comply with such reasonable modifications of the project structure and operation in the interests of fish and wildlife resources as may be hereafter prescribed by the Commission upon the recommendation of the Secretary of the Interior, the Washington Department of Fisheries or the Washington Department of Game.
 
 
 [2]
 Roberts & Stewart, Energy and the Environment, in Setting National Priorities: The Next Ten Years 451-52 (H. Owen & C. Schultz ed. 1976)
 
 
 [3]
 Resources for the Future, Energy: The Next Twenty Years 26-27 (1979)
 
 
 [4]
 In addition, I do not think the Commission gave adequate consideration under the National Environmental Policy Act to a lower dam alternative. Any study of a 1675' elevation, which would acknowledgedly cause substantially less environmental damage (although the amount is disputed), was dismissed by the Commission as "unwarranted" solely because a 1675' reservoir, even though it would produce the same maximum peaking power as at 1725', could not sustain that peaking capacity for as long a period. J.A. 287. In short, the Commission says the lower dam is not a real "alternative" since it cannot meet Seattle's peaking power needs in all possible situations
 I do not agree with the Commission that this is the test for assessing alternatives. In the continual balancing process between energy needs and environmental protection, the alternatives within consideration cannot be limited to those that will produce exactly the same energy goals; rather they must include means that may fall somewhat short of producing the same energy ends (within reasonable limits) at the same time they sacrifice less of the environmental goals. Were the Commission's test here for a reasonable alternative applied generally, defined energy goals of projects need never be adjusted due to environmental damage, the function of the EIS would be so limited as to defy its statutory aim, see 42 U.S.C. § 4332 (1976) (requiring the inclusion of "alternatives to the proposed action" in the EIS), and federal officials need never make the hard decisions balancing energy and environment, once the applicant had decided on the desired energy need.
 Although an EIS is not defective because it fails to deal completely with "each and every conceivable variation of the alternatives stated," Brooks v. Coleman, 518 F.2d 17, 19 (9th Cir. 1975); accord, NRDC v. Morton, 458 F.2d 827, 837-38 (D.C.Cir.1972), here the 1675' reservoir was at least "a colorable alternative," and the Commission's perfunctory rejection of it was insufficient, in my opinion, to indicate that its consideration was reasoned and rational. See Aeschliman v. Nuclear Regulatory Commission, 547 F.2d 622, 628 (D.C.Cir.1976). There are significant unanswered questions as to how much less sustained generating capacity a 1675' dam would produce as well as how badly Seattle needs that extra peaking potential, and what environmental benefits would be achieved by the lower dam. What the record does show is that the 1725' height was chosen 50 years ago long before environmental concerns had surfaced and without the benefit of 50 years' experience with varying flows and unpredictable power demands and shortages. While I do not suggest that the Commission was under a duty to evaluate all heights between 1602.5' and 1725', the height of 1675' was an obvious candidate since peak generating capacity is the same there as at the 1725' level.
 
 
 [5]
 By proposing his § 4(e) conditions the Secretary of Interior necessarily assumed that a "reservation" was involved. The definition of the term "reservations" is set out at 16 U.S.C. § 796(2) (1976):
 (2) "reservations" means national forests, tribal lands embraced within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also lands and interests in lands acquired and held for any public purposes; but shall not include national monuments or national parks.
 In rejecting the Secretary's proposed § 4(e) conditions (at least in this proceeding) the Commission "assum(ed) arguendo that the Tribes' alleged interests constitute a 'reservation' within which the 'license' would be issued." J.A. 260A. Because the court's opinion does not decide this issue and because it will be involved in the Article 37 and/or license renewal proceedings, I will only point out that there are several possible theories for arguing that the dam here is within a "reservation."
 (1) Ross Dam is located on federal land within the Ross Lake National Recreation Area; the Recreation Area was 98 percent federal land when established in 1968, S. Rep. 700, 90th Cong., 1st Sess. 39 (1967), U.S. Code Cong. & Admin. News 1968, p. 3874. It is separate from North Cascades National Park, which it adjoins, compare 16 U.S.C. § 90 with id. § 90a, and appears to fall under the terms of 16 U.S.C. § 796(2). The Recreation Area extends from the Canadian Border (on both sides of the Skagit River) to several miles below Gorge Dam. See R. 10043. The Tribes' "usual and accustomed fishing places" on the Skagit River at the signing of the Treaty of Point Elliot "extend(ed) . . . upstream to Gorge Dam," United States v. Washington, 384 F.Supp. 312, 379 (W.D.Wash.1974), aff'd, 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). If the Recreation Area constitutes a reservation, it therefore seems to encompass at least some of those fishing places.
 (2) A federal "reservation" includes an implied right to sufficient water to fulfill the purpose of the reservation. Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). Ross Dam is thus perhaps "within" the reservation consisting of the Indians' fishing rights below Gorge Dam because Ross Dam is physically "within" the flow of the Skagit River.
 
 
 [6]
 I do not here set out any position on whether the Commission must accept such conditions since that is at issue in the ongoing proceedings and because we have been requested not to do so by the two Secretaries. In my view, however, the proper forum for determining this issue was this proceeding
 Section 4(e) states that "licenses . . . within any reservation . . . shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations (sic) . . . ." 16 U.S.C. § 797(e) (emphasis supplied). The Commission, as noted above, emphasized that Seattle's license amendment does not propose any permanent change in the releases from Gorge Dam and found there was no basis in the record for concluding that fluctuations in water temperature would increase the death rate of the young fish. J.A. 260-60A. The Commission then simply concluded that it "(did) not agree" with the Indians' § 4(e) argument and that "(f)urther discussion of the Tribes' Section 4(e) arguments is therefore unnecessary." Id. at 260A. It subsequently made the bare § 4(e) finding that the license amendment "will not interfere or be inconsistent with the purpose of (sic) which any reservation was created or acquired." Id. at 270A.
 The Commission has taken the position in the past, however, that conditions proposed by the Secretary are mere recommendations which the Commission is free to disregard if in its judgment they are unwise or unnecessary. Escondido Mutual Water Co., Project No. 176, FERC Op. 36 (Feb. 26, 1979) (slip op. 106-08); see also Pacific Gas & Electric Co., 53 F.P.C. 523 (1975). The Commission's position on the § 4(e) issue therefore seems clear, despite its failure here to explain why it does not agree with the Indians' position.
 
 
 [7]
 The Indians and intervenors focused on the legal arguments relating to §§ 10(a) and 4(e) of the Federal Power Act and § 7 of the Wild and Scenic Rivers Act, rather than on the sufficiency of the record. The Indians did not move to reopen the record when they sought to intervene in October, 1976, and the Commission provided that "the Tribes take the record as they find it." J.A. 251
 
 
 [8]
 The Department of Interior also noted:
 Fish mortalities with minimum stream flows of 1,700 cubic feet per second (cfs) as originally requested by Washington Department of Fisheries have proven to be disturbingly high, and a reduction in flow to 1,000 cfs as permitted by Federal Power Commission license has been devastating. Continued stranding losses of salmonid eggs, larvae, and fry could decimate Skagit River salmon and trout stocks. Further, study and analysis is underway to document losses and to provide recommendations for adequate flows. Until more information is available, development of a streamflow compensation plan is impossible.
 The Ross Complex is a barrier to upstream movement of both resident and anadromous species, since fish passage facilities have not been provided. Irregular flows resulting from peak power operation of the Ross Complex has caused annual losses of salmon and trout larvae and fry due to stranding along gravel bars downstream. These losses continue to be a significant problem, and studies leading to a determination of adequate minimum flows are urgently needed.
 AI Br., App. A, Comments at 4 & 6.
 
 
 [9]
 The prepared testimony of a witness from the Interior Department at the hearings on the amendment noted the alterations in downstream flows caused by the present Ross Complex, R. 7598-600, and the potential for worse damage from an enlarged Ross Dam caused by lower released-water temperatures. Id. at 7610. That testimony also noted that during the construction and filling periods, "significant losses to fish populations" in the Ross Reservoir could occur. Id. at 7613
 
 
 [10]
 The Director of the Washington Department of Ecology stated: "(M)y experience over a long career of dealing with such problems leads me to say that when we are interfering with the natural environment, even the most carefully considered positive forecasts must be viewed with skepticism." R. 7413
 
 
 [11]
 One witness testified:
 . . . if you were to change the downstream flow regime, you would have a whole different project.
 The Environmental Impact Statement was based upon this flow regime not being changed, I would have to know what the change is and how it would affect the project and how it would affect the resource and right down the line.
 If there is going to be a change in the flow, this would require a significant change in the Application and a significant change in the Environmental analysis of that application.
 R. 8947.
 
 
 [12]
 That testimony was as follows:
 Q. In working your computations of the losses under certain conditions have you maximized the use of the downstream reservoirs, or reregulated them in effect?
 A. Yes, to the extent that they can be used for reregulating.
 Q. And what are the constraints on that use?
 A. Well, the main constraint is Gorge, because it is the down-river plant that also is, unfortunately, the bottleneck in the river. And its ability to reregulate is extremely minimal. It amounts to
 Q. When you say amounts to, are you giving me a storage capacity now?
 A. Well, I am attempting to. Its only ability to reregulate even limited is, for, say, a 24-hour period. It is not something that you can use for regulating on a 30-day average, because Gorge is built in a canyon where the walls are practically straight up and down, and there is for all intents and purposes, no storage.
 Q. Well, we are talking about the short-term periods I think where we are trying to stabilize the low flows, for example.
 A. Well, if we are talking on a 4-hour average, Gorge can do some reregulating. But it cannot reregulate entirely the output from the upstream plants.
 Q. (I)f the downstream project had more storage capacity then it would be of more use in reregulating the Ross discharge(?)
 A. Oh, yes, very definitely.
 Q. And if it had more storage capacity, that would decrease the losses that you have computed here for providing the flows which the Fisheries Department has requested(?)
 A. Yes. To the extent that we have been able to meet the minimum release clause of your offer, then we would be able to drop the minimum release it would also be the maximum. So that would have a very definite effect on us. But unfortunately, that is not the case with Gorge.
 R. 9690-92.